IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JERRYAL JEROME CULLER, SR., | ) | No. C 13-03871 BLF (PR) |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| v. | ) | |
| | ) | |
| SAN QUENTIN MEDICAL SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | (Docket No. 24) |

Plaintiff, a California inmate, filed a *pro se* civil rights complaint under 42 U.S.C. § 1983, against officials at San Quentin State Prison ("SQSP").[1] The Court found cognizable Plaintiff's Eighth Amendment claims, and ordered Defendants Correctional Officer M. Bloise,[2] Nurse T. Peterson and Dr. D. Leighton to file a motion for summary judgment or other dispositive motion.[3] Defendants filed a motion for summary judgment.

---

[1] The matter was reassigned to this Court on April 17, 2014.

[2] Plaintiff identified this defendant as "Sgt. Boise." (Compl. at 3.) Defendants identify him as "M. Bloise." We will defer to Defendants' spelling throughout this order.

[3] The Court dismissed claims against other defendants with leave to amend. (*See* Docket No. 6 at 7-8.) Plaintiff did not file an amended complaint thereafter. Accordingly, all other defendants and claims against them were terminated from this

(Docket No. 24, hereafter "Mot.")  Plaintiff filed an opposition, (Docket No. 27), and Defendants filed a reply, (Docket No. 28).

## DISCUSSION

**I.      Statement of Facts**[4]

On November 19, 2011, Plaintiff woke with severe pain in both legs and noticed that his big toe had no color in it. (Compl. at 3.)  He felt extreme pain in his calves, which felt as if they were on fire. (*Id.*)  He claims he had difficulty walking, but managed to "hobble" to the Officer Station and ask the desk officer to declare "man down." (*Id.*)  Defendant M. Bloise was present, and instructed the desk officer not to do so; she told Plaintiff to go to breakfast and put in a medical request. (*Id.*)  Plaintiff claims that because he was in so much pain, he went to the medical clinic and explained his problem to the medical correctional officer. (*Id.*)  The officer declared, "man down," and Plaintiff was wheeled to the prison hospital, which is known as the Triage and Treatment Area ("TTA"). (*Id.*)

Plaintiff claims that he was examined by Defendant R. N. Peterson, (Compl. at 4). but according to Defendants, Plaintiff was never treated by Nurse Peterson at that time or any other time. (Peterson Decl. ¶ 2.)  Rather, he was seen by Nurse Raja on November 19, 2011. (Jirn Decl. ¶ 2, Ex. A.)  The examining nurse noted warmness in the left foot which indicated an infection, and discoloration of the big toe. (Compl. at 4.)  Because there was no doctor at the hospital at that time, the nurse told Plaintiff that he would have to wait for a follow-up visit in a few days. (Compl. at 4)

Plaintiff claims that the following morning on November 20, 2011, the pain and cramps in his legs became worse.  When he again requested that "man down" be called, Defendant Bloise angrily refused, stating that Plaintiff was "walking fine." (*Id.*)  For the

---

action.

[4]The following facts are undisputed unless otherwise indicated.

next two days, Plaintiff claims that he endured "intense pain" and was refused assistance from officers at Defendant Bloise's orders. Meanwhile, Plaintiff had to rely on the assistance of another inmate to walk "back and forth to chow." (*Id.*)

On November 23, 2011, Plaintiff saw Defendant Dr. D. Leighton for the first time. According to Plaintiff, she noted discoloration in Plaintiff's big toe and warmth in his foot, but she omitted these facts from her report. (Compl. at 5, Ex. B at 1-3.) According to Defendants, Plaintiff did not appear to be in distress and made no mention of pain in his leg or foot. (Leighton Decl. ¶ 2; Compl. Ex. B at 1-3.) Defendant Leighton ordered a blood test and told Plaintiff she would see him again in two weeks. (*Id.*) Plaintiff claims that when he asked her how he should deal with the pain during this time, Defendant Leighton told him, "well you know that things are slow around here so suck it up!" (Compl. at 5.)

Plaintiff claims that over the next few days, whenever he attempted to get help from Defendant Leighton and other doctors in the TTA, they all refused; Plaintiff claims that Defendant Leighton was "especially critical in her refusal." (*Id.*) Plaintiff also claims that Defendant Peterson became more hostile toward him when he saw her on November 24, 25, 26 and 27, 2011, and threatened to write him up. (*Id.*) According to Defendants, Defendant Peterson never treated or otherwise attended to Plaintiff on these dates or at any other time. (Peterson Decl. ¶ 2; Jirn Decl., Ex. A.) Plaintiff claims that by this time, his toe had begun to turn blue. (Compl. at 5.)

On November 24, 2011, Plaintiff complained of pain in his legs and was examined at TTA by Dr. David, who is not a party to this action. (Compl., Ex. B at 5.) Plaintiff complained of tingling pain and numbness in his feet which had become worse in the last three days. (*Id.*) Dr. David observed "good pulses and capillarey [*sic*] refill." (*Id.*) He prescribed a low dose of amitriptyline for neuropathic pain, and a follow-up in a week. (*Id.*)

The following day on November 25, 2011, Plaintiff was seen by Dr. M. Jones, who is not a party to this action. (Jirn Decl. ¶ 3, Ex. B.) He received a thorough evaluation

Order Granting MSJ
N:\MY DRAFTS\Culler Grant MSJ Final March 16.wpd          3

and prescribed Tylenol with codeine for pain. (*Id.*) Plaintiff's strength was observed to be normal and his pulses palpable. (*Id.*) Other options for treatment were considered, but the alternatives were determined to be too dangerous because of Plaintiff's kidney disease and recent laboratory abnormalities. (*Id.*) A follow-up was ordered for the following day. (*Id.*)

On November 26, 2011, Plaintiff saw Defendant Leighton for a follow-up examination, during which she observed that his feet appeared the same as the last examination; there was no alteration in temperature, no dusky color, no skin breakdown to indicate poor circulation or a need for urgent intervention. (Leighton Decl. ¶ 5.) Based on Plaintiff's lab results from the previous day which were "reassuring," and to address Plaintiff's complaints of pain, Defendant Leighton prescribed long-acting morphine at 15 milligrams twice a day. (*Id.*)

Defendant Leighton saw Plaintiff next on November 30, 2011, at which time Plaintiff continued to complain of pain in his feet. (*Id.* at ¶ 6.) Upon examination, Defendant Leighton observed that Plaintiff's feet were cold and that his pulse was not palpable, he had edema in his feet (more severe on his left foot), but otherwise normal sensation in his feet except for the left heel. (*Id.*) Plaintiff's skin was intact with no discoloration or dusky area. She attributed the pain in Plaintiff's leg and feet to diabetic neuropathy, did not suspect a vascular cause, and continued Plaintiff's prescriptions for morphine and amitriptyline. (*Id.*)

On December 2, 2011, Plaintiff put in a sick-call slip about worsening pain in his foot, which was received by nursing on Saturday, December 3, 2011. (Leighton Decl. ¶ 7.) On December 4, 2011, Plaintiff was seen in the TTA by Dr. Jones, who then ordered an ambulance to transfer Plaintiff to Marin General Hospital ("Marin General"). (Compl. at 6; Leighton Decl. ¶ 7.) Defendant Leighton was not present at the institution or on call during this weekend, so she was unaware of Plaintiff's distress or able to help him. (Leighton Decl. ¶ 7.)

At Marin General, Plaintiff was diagnosed with a blood cot in his leg and the onset

of necrosis. (Compl. at 6-7, Ex. B at 13-20.) This did not improve and, eventually, Plaintiff's left big toe and forefoot were amputated. (*Id.*) Plaintiff spent the next three weeks in the intensive care unit at Marin General. (*Id.*) He stayed there until January 6, 2013, when he was determined to be stable enough to be transferred to Kentfield Rehabilitation Center. (*Id.*)

Based on these allegations, the Court found that Plaintiff stated a cognizable Eighth Amendment claim of deliberate indifference to his serious medical needs against Defendants Bloise, Peterson and Leighton.

## II.   Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the evidence

in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *See Liberty Lobby*, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citations omitted). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a material fact. *See T.W. Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. It is not the task of the district court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Id.* If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *See id.*; *see, e.g.*, *Carmen v. San Francisco Unified School District,* 237 F.3d 1026, 1028-29 (9th Cir. 2001).

### A.     Deliberate Indifference

Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *Id.*

The following are examples of indications that a prisoner has a "serious" need for medical treatment: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds, WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. The official must both know of "facts from which the inference could be drawn" that an excessive risk of harm exists, and he must actually draw that inference. *Id.* If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002).

"A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference, *see Toguchi v. Chung*, 391 F.3d 1051, 1058, 1059-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that he or she chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

### B. Claims against Defendant Officer Bloise

The evidence presented does not show a genuine dispute as to any material fact

relating to Plaintiff's claim of deliberate indifference against Defendant Bloise. It is undisputed that Plaintiff requested "man down" on November 19 and 20, 2011, and that Defendant Bloise denied the requests. However, Plaintiff cannot show that Defendant Bloise did so knowing that Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. Defendants have presented undisputed evidence that "man down" is to be called only for emergencies, such as when an inmate has fallen and is unable to get up, is unresponsive, appears to have difficulty breathing, is having chest pains or a seizure, or any other life threatening emergency. (Bloise Decl. ¶ 2.) A "man down" requires that everyone in the surrounding area, including the surrounding units, stop what they are doing until the medical providers from TTA can assess the situation. (*Id.*) Therefore, a "man down" is reserved for "true emergencies" because of the institutional disruption that results. (*Id.*)

      Plaintiff admits that on November 19, 2011, when his first "man down" request was denied by Defendant Bloise, he was able to "hobble" to the Officer Station and verbally request a "man down." *See supra* at 2. When he repeated his request the next day, he was also walking and able to make the verbal request. *Id.* at 2-3. Defendant Bloise states in her declaration that based on her observation of Plaintiff on these days, she denied the requests because the situation did not call for a "man down," *i.e.*, Plaintiff exhibited none of the life threatening symptoms that would warrant such a call. (Bloise Decl. ¶ 3.) Defendant Bloise also referred Plaintiff to the medical clinic for what appeared to be a non-emergency medical situation. *See supra* at 2. It is undisputed Plaintiff was in fact able to go to the medical clinic and receive attention on November 19, 2011, and that he was able to walk with assistance to his meals. *Id.* Accordingly, it cannot be said that Defendant Bloise acted with deliberate indifference when she directed Plaintiff to put in a medical request rather than call "man down," especially as Plaintiff was clearly not exhibiting life threatening symptoms but rather, was conscious and ambulatory, albeit with the assistance of another inmate, and capable of getting himself to

the medical clinic.

In opposition, Plaintiff merely repeats the factual allegations in his complaint. (Opp. at 5.) He also submits the declarations of three inmates stating that Defendant Bloise did indeed refuse to call "man down" as evidence against Defendant Bloise, but as stated above, this fact is not in dispute. (*Id.*, Ex. A.) The declarations also mention that Defendant Bloise threatened to issue a "115" [Rules Violation Report] to Plaintiff for using a wheelchair or to other inmates for assisting him. (*Id.*) First of all, the Court notes that Plaintiff made no specific allegation in his complaint that Defendant wrongfully interfered with his use of a wheelchair or assistance from other inmates. (Compl. at 4.) Furthermore, the fact that Plaintiff had access to a wheelchair indicates that he was not as helpless or immobile as he implies. Lastly, Defendant Bloise states in her declaration that for safety concerns, only inmates and correctional staff or medical personnel who receive training in the operation of wheelchairs are permitted to push other inmates in wheelchairs. (Bloise Decl. ¶ 4.) Accordingly, Plaintiff cannot show that Defendant Bloise was acting with deliberate indifference to Plaintiff's serious medical needs when making such threats, if she indeed did so, where she was following prison policy to protect Plaintiff's safety and that of the untrained inmates attempting to assist him with the wheelchair. (*Id.*)

Based on the evidence presented, Defendant Bloise has shown that there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference claim against her. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff merely repeats the factual allegations in his complaint and has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279. Accordingly, Defendant Bloise is entitled to judgment as a matter of law. *Id.*; Celotex *Corp.*, 477 U.S. at 323.

C. **Claims against Defendant Nurse Peterson**

With respect to Plaintiff's claims against Defendant Nurse Peterson, Defendants

have submitted evidence showing that Defendant Peterson never treated Plaintiff at any time alleged in the complaint. *See supra* at 2, 3. The TTA Treatment Log shows that Plaintiff was seen on November 19, 2011, by Nurse Raja, not by Nurse Peterson. (Jirn Decl., Ex. A.) The same log shows that Defendant Peterson had no contact with Plaintiff on November 24, 25, 26 or 27, 2011. (*Id.*) The possibility that Plaintiff may have misidentified this particular Defendant is bolstered by the fact that he consistently refers to Defendant Peterson as a male, (*see* Compl. at 4), when she is in fact female.

Even if we assume as true Plaintiff's allegations against Defendant Peterson, he fails to show that she acted with deliberate indifference to his serious medical needs. First of all, when he saw her on November 19, 2011, Defendant Peterson did not turn him away but conducted an examination of his left foot, noting . *See supra* at 2. With respect to her statement that there was no doctor at the hospital at that time, Plaintiff has failed to show that this was not in fact true, or that Defendant Peterson purposefully delayed or interfered with Plaintiff's access to a physician. Rather, Plaintiff was examined by a doctor just four days later. *Id.* at 3. Plaintiff has not alleged that Defendant Peterson was actually responsible for this delay, or that such a delay was of unconstitutional proportions. *Compare McGuckin*, 974 F.2d at 1062 (delay of seven months in providing medical care during which medical condition was left virtually untreated and plaintiff was forced to endure "unnecessary pain" sufficient to present colorable § 1983 claim).

With respect to Plaintiff's claim that when he saw Defendant Peterson on November 24, 25, 26 and 27, 2011, she was hostile and threatened to write him up, even if we assume this is true, there is no evidence that she disregarded a substantial risk of serious harm to Plaintiff's health and failed to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837. Rather, the undisputed evidence shows that Plaintiff was seen by Dr. David on November 24, 2011, by Dr. Jones on November 25, 2011, and Defendant Dr. Leighton on November 26, 2011. *See supra* at 3-4. Because Plaintiff was actually receiving treatment during the days on which he claims Defendant Peterson was "hostile," it cannot be said that she purposefully failed to respond to Plaintiff's medical needs with

the knowledge that if she did not act, Plaintiff would face greater harm. In other words, Plaintiff has failed to show that Defendant Peterson both knew of "facts from which the inference could be drawn" that an excessive risk of harm existed, and she actually draw that inference. *See Farmer*, 511 U.S. at 837.

Again in opposition, Plaintiff merely repeats the allegations from his complaint, (Opp. at 5, 6), and presents no evidence indicating that his identification of Defendant Peterson is accurate to refute the evidence presented by Defendants. Accordingly, based on the evidence presented, Defendant Peterson has shown that there is no genuine issue of material fact with respect to Plaintiff's claim against her. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279. Accordingly, Defendant Peterson is entitled to judgment as a matter of law. *Id.*; Celotex *Corp.*, 477 U.S. at 323.

### D.   Claims against Defendant Dr. Leighton

Lastly, Plaintiff claims that the treatment he received from Defendant Dr. Leighton was constitutionally deficient. After reviewing the evidence presented, the Court finds that while Plaintiff may at best state a claim of medical malpractice or negligence, which are insufficient to make out a violation of the Eighth Amendment, *see Toguchi v. Chung*, 391 F.3d 1051, 1060-61 (9th Cir. 2004), he ultimately fails to show that Defendant Leighton acted with deliberate indifference to his serious medical needs.

Plaintiff first saw Defendant Leighton on November 23, 2011. According to the undisputed evidence, Defendant Leighton was seeing Plaintiff for an initial primary care medical evaluation since he had recently transferred from another prison. (Leighton Decl. ¶ 2; Compl. Ex. B at 1-3.) The report from that examination indicates that she did a thorough review of his medical history and current chronic medical problems, which included kidney disease ("minimal change disease"[5] on biopsy) with nephrotic syndrome,

---

[5]According to Defendants, "minimal change disease" is "a kidney disorder that can lead to nephrotic syndrome, which refers to a group of symptoms that include protein in

diabetes, hyperlipidemia,[6] chronic obstructive pulmonary disease[7] and hypertension.[8] (*Id.*) Plaintiff does not refute the accuracy of this information. Plaintiff was also on a high dose of prednisone, which is used to treat the symptoms of low corticosteroid levels as well as conditions in other patients with normal corticosteroid levels, including arthritis, severe allergic reactions, multiple sclerosis, lupus, and certain conditions that affect the lungs, skin, eyes, kidneys, blood, thyroid, stomach and intestines. (Mot. at 6, fn. 10.) Plaintiff did not appear to be in distress and made no mention of pain in his leg or foot. (Leighton Decl. ¶ 2; Compl. Ex. B at 1-3.) Defendant Leighton ordered a blood test and a follow-up in two weeks. (*Id.*) Accordingly, it cannot be said that Defendant Leighton was deliberately indifferent to Plaintiff's medical health where she conducted a thorough examination and ordered appropriate tests and follow-up care.

Furthermore, Plaintiff's claim that Defendant Leighton disregarded his complaints of pain is refuted by the medical records which show that he made no mention of pain in his legs or feet. (*Id.*) Because her examination notes indicate that she found nothing emergent in Plaintiff's condition, it cannot be said that Defendant Leighton both knew of facts from which the inference could be drawn that an excessive risk of harm existed and that she actually drew that inference. *See Farmer*, 511 U.S. at 837. As for Plaintiff's claim that Defendant Leighton failed to record her observations of discoloration in his big toe and warmth in his foot, this act, even if true, does not indicate deliberate indifference because the examination notes indicate that she was not actually aware of any risk to

---

the urine, low blood protein levels, high cholesterol levels, high triglyceride levels, and swelling usually caused by different disorders that damage the kidneys, including excessive use of prednisone." (Mot. at 5, fn. 5.)

[6]According to Defendants, "[h]yperlipidemia is a condition involving abnormally elevated levels of any or all lipids and/or lipoproteins in the blood." (Mot. at 5, fn. 7.)

[7]According to Defendants, "[c]hronic obstructive pulmonary disease is a disease that makes it hard to breathe." (Mot. at 6, fn. 8.)

[8]According to Defendants, "[h]ypertension refers to high blood pressure." (Mot. at 6, fn. 9.)

Plaintiff's health at that time; even if Defendant Leighton should have been aware of the risk, she has not violated the Eighth Amendment because she in fact was not. *Gibson*, 290 F.3d at 1188.  Lastly, to the extent that Plaintiff may have disagreed with Defendant Leighton's chosen course of treatment, it is well settled that such a difference of opinion between a prisoner-patient and his prison doctor regarding treatment does not give rise to a § 1983 claim. *Franklin*, 662 F.2d at 1344.

Defendants have also provided evidence refuting Plaintiff's claim that his requests for assistance over the days following the initial examination by Defendant Leighton were refused by her and other doctors.  Rather, the undisputed evidence shows that Plaintiff was seen on consecutive days by different doctors immediately thereafter.  The next day on November 24, 2011, Plaintiff saw Dr. David.  *See supra* at 3.  At this examination, Plaintiff first mentioned tingling pain and numbness in his feet, which he claims had become worse in the last three days.  *Id*.  Dr. David observed "good pulses and capillarey [*sic*] refill."  *Id*.  He prescribed pain medication and a follow-up in a week, which indicates that Dr. David did not find anything emergent in Plaintiff's condition.  *Id*. Nevertheless, Plaintiff again sought medical attention the next day, and was seen by Dr. Jones.  *Id*.  Dr. Jones completed a thorough examination, and observed that Plaintiff's strength was normal and his pulses palpable.  *Id*. at 4.  He also prescribed medication to address Plaintiff's complaints of pain, and found that treatment options were limited due to Plaintiff's kidney disease and recent laboratory abnormalities.  *Id*.  He ordered a follow-up for the next day.  *Id*.  When Plaintiff saw Defendant Dr. Leighton on November 26, 2011, for the follow-up,  she found no change in Plaintiff's feet from her last examination.  *See supra* at 4.  She did, however, prescribe morphine to address his recent complaints of pain.  *Id*.  Accordingly, it cannot be said that Defendant Leighton deliberately failed to treat Plaintiff's complaints of pain once it was brought to her attention.

Defendant Leighton saw Plaintiff again on November 30, 2011, which was just another four days after his last visit.  *See supra* at 4.  She noticed that Plaintiff's feet were

cold and that his pulses were not palpable. *Id.* She also noted that Plaintiff had edema on his feet, which was more severe on his left foot, and that Plaintiff had normal sensation in his feet except for the left heel. *Id.* There was no discoloration or dusky areas in his skin. *Id.* Based on her observations and Plaintiff's medical history, Defendant Leighton determined that Plaintiff's condition was caused by diabetic neuropathy and did not suspect a vascular cause. *Id.* She continued Plaintiff's pain medications. *Id.* Even if Defendant Leighton's diagnosis was ultimately incorrect, it cannot be said that she acted with deliberate indifference to Plaintiff's medical needs because there is no indication that she knew Plaintiff faced a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 834. Furthermore, to the extent that Plaintiff is challenging her chosen course of treatment, he must show that the course of treatment Defendant Leighton chose was medically unacceptable under the circumstances and that she chose this course in conscious disregard of an excessive risk to Plaintiff's health. *Toguchi*, 391 F.3d at 1058. However, there is no such evidence, and Plaintiff does not provide any, to indicate that Defendant Leighton's chosen course of treatment was constitutionally deficient. *Id.* As discussed above, Defendant Leighton must have both known of facts from which the inference could be drawn that an excessive risk of harm to Plaintiff's health existed, and she must actually have drawn that inference. *See Farmer*, 511 U.S. at 834. According to the evidence presented, she did not.

In opposition, Plaintiff merely repeats the allegations from his complaint, (Opp. at 6), and presents no evidence to refute Defendants' evidence. Accordingly, based on the evidence presented, Defendant Leighton has shown that there is no genuine issue of material fact with respect to Plaintiff's Eighth Amendment claim against her. *See Celotex Corp.*, 477 U.S. at 323. In response, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *id.* at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279. Accordingly, Defendant Leighton is entitled to judgment as a matter of law. *Id.*; Celotex *Corp.*, 477 U.S. at 323.

Order Granting MSJ
N:\MY DRAFTS\Culler Grant MSJ Final March 16.wpd            14

# CONCLUSION

For the reasons stated above, Defendants Correctional Officer M. Bloise, Nurse T. Peterson and Dr. D. Leighton's motion for summary judgment, (Docket No. 24), is **GRANTED**.[9]  The claims against them are **DISMISSED** with prejudice.

This order terminates Docket No. 24.

**IT IS SO ORDERED.**

DATED:   March 16, 2015

*/s/ Beth Labson Freeman*
BETH LABSON FREEMAN
United States District Judge

---

[9] Because the Court finds that no constitutional violation occurred, it is not necessary to reach Defendants' qualified immunity argument.